Good morning, Your Honors. William J.T. Brown, representing plaintiff appellant Joan Kearney. We come before the Court with a third dismissal of our case. Mrs. Kearney owned some land near San Diego. She had planned to build a housing development on the land, but the Ramona School District wanted it for a school, which was fine by her. They entered three separate agreements to sell the property voluntarily to the Ramona School District. These agreements were backed out of by the school district, and it took the property by eminent domain. Mrs. Kearney didn't object to that, but she wanted fair value. Now, the crucial discovery element in the eminent domain proceeding was percolation tests in the soil to show how many toilets, how many school rooms, how many houses in the development could be established. These percolation tests were paid at great expense by the school district, but defendants did not turn over the tests, and indeed they denied that they existed. The tests were discovered by Mrs. Kearney only after the eminent domain proceedings were concluded and the valuation was finished. She could have discovered them earlier, though, couldn't she, by sending a subpoena to CTI? She did make discovery demands. She could have done more, of course. When they said there weren't any, the jury believed them. So even if we assume that there was discovery misconduct and that maybe even evidence was suppressed, why doesn't collateral estoppel preclude this from being relitigated? She didn't have a full and fair opportunity to litigate. Well, why didn't she have an opportunity? Well, as Chairman mentioned, she could have done things she didn't do, but that doesn't mean she didn't have an opportunity to do them. She didn't know that she had to do these other things. These are very expensive tests. She spent over $10,000 doing her own tests. No, but she could have taken discovery. She could have. This came up at the first dismissal, when it was suggested that she could have found out about the tests by greater efforts. Judge Pagerson at that time said, following a trail of breadcrumbs is not really what's required. We recall the Decker case, City of Los Angeles v. Decker. Lawyers who were handling land takings for municipalities have an ethical obligation. But collateral estoppel didn't come up on that first appeal, did it? Let me just quickly run through those. The first appeal was the case was dismissed on grounds of Knorr-Pennington. Right. Judge Lorenz thought that they were just a matter of petitioning. Right. And the second one was dismissed on statute of limitations. And RICO both got reversed. This is the first time we're talking about collateral estoppel. And I do want to talk about collateral estoppel more than res judicata. And under collateral estoppel, my understanding of California law is that California gives preclusive effect to earlier proceedings, even when there's suppression of evidence or other discovery, misconduct, and especially where those things could have been discovered in the earlier proceeding and you could have obtained the relief by seeking new trials or other avenues of relief in the earlier trials. There's got to come a time when litigation stops. So why isn't this precluded under the doctrine of collateral estoppel given California precedent? I think that the judge did not preclude it on grounds of collateral estoppel. He went on grounds of res judicata, plain preclusion, preclusion of the entire claim. And he is clearly, and we agree that California law does determine the effect of res judicata. And the judge below I think maybe may have made an error on the privity analysis for res judicata. And the alternative grounds that's being urged before us now for affirmance is collateral estoppel. And why isn't that a correct alternative ground for affirmance? Collateral estoppel was not the basis for the judge's decision. Well, yes, that's true. The court analyzed it on res judicata grounds. In all fairness, I don't think the parties really addressed the lack of privity issue for the district court's consideration. But I think what Judge Hyman is saying, even assuming the district court made a mistake by analyzing this on res judicata grounds rather than collateral estoppel, why can't we at this point with the record that we have say it's issue preclusion at this point? Well, I think that there's a lot of fact issues about whether there was fairness in the discovery process. Well, but that gets back to Judge Hyman's other point, which is California law still gives preclusive effect to final judgment because otherwise there will be endless rounds of litigation even if there is some underlying misconduct. Remember, we are not trying to set aside the taking of the land or the price that was paid for the taking of the land. What we challenge is the RICO violation and the other violations that were committed against Mrs. Kearney. That's just a collateral attack, though, isn't it? We're not collaterally attacking the taking of the land. I mean, where would be the harm that would be suffered if there were a RICO violation but for that she didn't get enough from the eminent valuation trial? She's litigated for 18 years, and this has caused great psychological damage to her. She has that damage in addition to the monetary damage that resulted from the failure to provide discovery. Is that cognizable under RICO? I beg your pardon? Is that cognizable under RICO? Cognizable under the Civil Rights Act. Right. But not under RICO, is it? Possibly not. Okay. Judge Wynn, I believe you're correct in saying that Judge Natalia made a mistake in regard to race judicata. He adopted a draconian—we agree that California law doesn't cover the effect of a California judgment. Under the Full Faith and Credit Clause, the California judgment has the effect that state law imputes to it as long as it's consistent with due process. Here we feel that it wouldn't be consistent with due process to deny Mrs. Kearney her rights that she didn't even know she had at the time that the eminent domain proceedings ended. The rights, you may recall, the last time before you were on the panel. There was a case— Although we didn't deal with the collateral estoppel issue then. No, you didn't. It wasn't collateral estoppel. But it was the fact that the claim had not even come into existence. Wasn't there a case in the California Court of Appeals, KASHIG, K-A-C-H-I-G versus Booth, where the California Court of Appeals refused to recognize a claim for intentional infliction of emotional distress based on litigation misconduct that occurred in an earlier proceeding, and the theory was that otherwise you're going to keep on litigating in a collateral fashion. I mean, how do you get around the KASHIG versus Booth case? Well, that was asking California to come up with a cause of action, to create a cause of action out of whole cloth. We're suing here under RICO and under the Civil Rights Act. Well, under RICO, I think we've already talked about whether or not those emotional distress damages may or may not be cognizable. Under 1983, the Civil Rights Act claim, I mean, isn't that the same problem? If you're seeking emotional distress caused by an alleged misconduct. I mean, if you take a look at earlier litigation where there's misconduct, and that could have been discovered, but under collateral estoppel principles, we're moving on. There has to be finality to litigation. Now you're saying, well, it could be a violation of civil rights where you have suffered emotional distress because the court system has not given you a fair opportunity. We're just relitigating those things. I mean, looking at it incorrectly. Well, I think we're suing under federal statutes here. We're seeking money. We're seeking compensation. We're also claiming emotional damage, which is cognizable under the. Under 1983. 1983. I agree with that. But I'm thinking that what you're trying to do is use 1983 to say that the state action of a state court caused emotional distress because they engaged in, the parties engaged in misconduct below that wasn't corrected in the lower courts. Your Honor, our main point is that this is not grace judicata. And we also say it is not collateral estoppel. And our main point is there was not a full and fair opportunity to litigate this case. There wasn't a full and fair opportunity to litigate the value of the land, and there wasn't a full and fair opportunity to litigate the RICO case. This court reinstated the RICO claim the last time we were here. And it also said that the claim had not yet come into existence. But what would happen under this new dismissal is that the case would be thrown out and Mrs. Curry would be denied the right to assert claims she didn't even know that she had, claims that this court said she hadn't even come into existence. So I wanted to emphasize the D.K.N. Holdings case. That's California law, 2015 from the Supreme Court. It helps you on the grace judicata? It hurts you on collateral estoppel? Well, we don't, well, if you feel that way, Judge. Okay. It may or may not. We feel it's a clear indication that the court below was wrong in dismissing the case. There isn't that effect coming from California restudicata law. I think you might want to save the rest of your time to rebuttal. Okay. Thank you, Judge. Thank you. Thank you. May it please the Court, James Siegel, on behalf of the Foley and Lardner defendants, I'll be sharing my time with Counselor Mr. McCarty, who's arguing separately. Plaintiff Joan Kearney litigated the value of her property in California State Court. The jury found it was worth a little less than a million dollars. That judgment is final, has been for nearly 15 years at this point. Yet Kearney continues to seek to relitigate that issue. That's exactly what the doctrines of restudicata and collateral estoppel are intended to prevent. I'll begin with collateral estoppel, just given the Court's questioning, and I do think that provides a very clean alternative ground on which to affirm the District Court's judgment here. The jury found in the California State Court proceeding that Kearney's property was worth $953,000. She's now precluded from contending otherwise. She can't prove that her property was worth more than that amount. As a result, all of her claims necessarily fail because they all necessarily depend on the contention that her property was worth more. What about her emotional distress claim under 1983? Because even if she can't prove otherwise on the value because of collateral estoppel, she now looks back on it and says, you know what, I lost that trial because they put on or withheld evidence and misled the Court and misled me. That caused me emotional distress. Therefore, I bring a 1983 claim. What's wrong with that? So her 1983 claim is a takings claim. In order to prove a takings claim, you have to prove that your property was taken without just compensation. So if she received what her property was worth, she necessarily received just compensation. So emotional damages would be consequential damages, but they wouldn't be consequential to any violation of the Constitution, so she couldn't recover that. So if there were takings, she could also possibly recover emotional distress damages, but if there's no unconstitutional takings, 1983 is out. Right, and that's true as a matter of collateral estoppel. The ratio to Codd analysis is a little different, and I'll turn to that later. But then so the takings claim is out if her property is worth $953,000. And what about on RICO? So under RICO, she has to either prove that she suffered an injury to her business or property interest, and her business or property interest that's at issue here is her land. She couldn't have suffered any injury to that business or property interest if she got exactly what that land was worth, which is $953,000. This court has held that, you know, subsequent financial costs incurred or emotional distress, those aren't cognizable RICO injuries to a business or property. And so, again, if her property is worth $953,000, the jury definitively determined it was, her RICO claims fail. Kearney's counsel hasn't disputed any of that here. What he contends is that she was denied a full and fair opportunity to litigate the issue. But as Your Honor noted, California courts have been very clear that the suppression of evidence or perjure, what's termed intrinsic fraud, can't be grounds to disregard the preclusive effect of a prior judgment. That's true both with respect to collateral estoppel and to res judicata. Katschig is an example, a number of other examples we've cited in our brief, including the Cedars-Sinai case where the court collected all these decisions and made clear that that principle applies to both collateral estoppel and res judicata. So the sole question is whether the state court proceedings comported with due process. And they undoubtedly did. Ms. Kearney received a full trial on the merits of this issue. She was before a jury. She presented evidence. She cross-examined witnesses. She was represented by an attorney. A litigant's supposed discovery violation within that proceeding can't deprive her of due process. And that's especially true because, as Your Honor noted, she had procedures at her disposal that would have enabled her to discover these supposedly suppressed tests. That's actually what the trial court found at the state court level, as did the court of appeal when it reviewed this case. And so that's all it takes to affirm the judgment here. I would turn briefly to the res judicata issue as well. But if you wrongfully withheld evidence, there's no remedy for that? Well, there are remedies, Your Honor. So during the course of trial, she could have sought sanctions, for example. She didn't discover it until after the trial? She could move for a new trial, as she did here. It had to be able to convince the court that she was, in fact, deprived of a fair trial due to the suppression of this evidence. That would have been grounds for setting aside the judgment, allowing her to relitigate that issue. But once the judgment is final, as a matter of California law, she's precluded from collaterally attacking it. The remedies in the Cedars-Sinai case that we've said in our brief, the California Supreme Court's decision, covers this. So other remedies include she could move for bar proceedings against counsel. How would that help her? Well, just to remedy the— California courts have made clear that they want to ensure that the litigation is over once the judgment is final. And so if the plaintiff wants to recover in any way, they must do so before the judgment is final. That dates all the way back to the Pico v. Cohn case in the 1890s. But because there is, of course, an interest in preventing attorneys from misrepresenting or suppressing evidence, there are these other— But that doesn't help the plaintiff if the attorney is disciplined. No, once the judgment is final, the plaintiff has no remedy. That's clear as a matter of California law. After a judgment becomes final under California law, how much time, if any, is allowed to seek to reopen the judgment on the grounds of basically intrinsic fraud or basically a discovery abuse or suppression? Once the judgment is final? I'm not sure, Your Honor. It's certainly—we're long past that point now. All right. But there is some procedure, isn't there, in California where after a judgment becomes final, and you then learn, if you were then to learn that there was serious discovery abuse or suppression of evidence, you could then ask to have it reopened and ask the California trial judge for a new trial? There is a Rule 60B equivalent. That didn't work here because she had already appealed the judgment. When she, again, sought to bring a new motion for a new trial, I believe the proper procedure would have been for her to dismiss her appeal, return to the district court, which would then have jurisdiction again and make that equivalent of a 60B. That wasn't the procedure she followed. But turning quickly to the Rishi Dukata issue, in fact— Before you do that— Yes, Your Honor. Did she learn of this—whatever it is, disputed information— did she learn of it while there was still time to make a motion in California to reopen? Yes, Your Honor, she did. So she learned that—she saw some sort of cost sheet that indicated that this sort of testing might have occurred, and that was before—I think it was right around the time of the verdict. And so she moved for a new trial on the basis of this cost sheet and said, look, there must be percolation testing. It must have been suppressed. The trial court considered that motion and said, essentially, you didn't want to—you could have sought this information, but you didn't—you made a strategic decision not to because you wanted to rely on your earlier percolation testing and not some new percolation testing, which could have either been favorable to you or not favorable to you. So, yes, she was aware this percolation testing existed before the judgment became final. She made a motion on that point. And that was considered by the trial court, and she could have appealed that up to the counsel? Well, she did appeal that, and they affirmed. So that has been rejected. I would also just emphasize that counsel referenced the prior appeals. Certainly neither of the prior appeals addressed this particular issue. They also weren't on—they were both at the motion-dismiss stage. Now we're at summary judgment. And so just to pivot quickly to the North Pennington issue in my remaining time, she alleged that the defendants had committed intentional fraud, intentionally suppressed this evidence, intentionally misrepresented its existence to the court, and she had ample allegations to support that. And that's what this court relied on in concluding that the North Pennington Doctrine didn't preclude her suit. At the summary judgment stage, it became clear that there was no evidence to support those. So in response to the defendants' evidence suggesting that they did not actually know that this percolation testing existed, she submitted no evidence. She continued to rely on her prior allegations or complaint. Wasn't the Foley and Lardner lawyer—was that Thompson? Wasn't he at the deposition of—was it McCarty? In which McCarty talked about that testing. So one of the Foley and Lardner lawyers was at the deposition of Mr. McCarty, where Mr. McCarty said he thought that percolation testing might have occurred. He didn't say he knew whether or not it actually had occurred. He didn't say anything about the existence of an actual written report indicating what had happened in that testing. He just said it might have occurred. And, of course, Kearney's attorneys were present at that deposition as well, so they had the same indication that it might have occurred. That fact was never suppressed. But if we get to the stage of North Pennington, doesn't that create a fact issue on the sham question, at least for Foley and Lardner? No, Your Honor, because in order for there to be a sham, there would have to be intentional fraud that deprived the litigation of its legitimacy. At most, that would show that Mr. Marshall might have had some reason to suspect this percolation testing might have been out there. It wouldn't show that he intentionally suppressed it. Well, but he told the court that there was no testing, right? He told the court that there hadn't been any complete testing done since 1996.  I'm not going to be the jury on that case, but it does seem that that's at least a fact question on his intent to misrepresent, at least for the sham exception to North Pennington. Your Honor, I think there's a distinction between knowing the possibility that some testing results might exist and actually knowing that they do in fact exist and intending to suppress them. I think perhaps there's evidence of the former. I don't think there's any material dispute of fact as to the latter. If this Court has no further questions, I'd see the remainder of my time. May it please the Court, Paul Corelli on behalf of Dr. McCarty. Very quickly, I heard His Honor mention the privity issue with respect to res judicata, and with respect to Dr. McCarty and the district, I believe they are in privity. He was the business manager. He was working alongside the district and was responsible for building a school on the land that was condemned that was previously owned by Ms. Kearney. That may be different than the lawyers in Foley. On the North Pennington issue, with respect to Dr. McCarty, what I see from the plaintiff and appellant in this case is that they continue to rely on the allegations in this case rather than the actual evidence in this case of what Dr. McCarty is allegedly to have done wrong. The evidence in the case is that the discovery request was made to the district as part of this condemnation action. Dr. McCarty gathered up all the materials that he was supposed to gather. He sent them to the lawyers. The PERC tests at issue were never in the possession of the school district, never in Dr. McCarty's possession. We know what happened to those PERC test data. The pages were drafted by the engineering company, CTE. We know that the architect who was really directing the building of the school had told the engineer that he didn't need to continue his work. He was going to draft a report, but he ended up not doing it. And what concerns me is that the main allegation in the complaint is that Dr. McCarty is alleged to have told the engineer to don't write a report, stop work, with the intent to defraud Ms. Kearney. And that is simply not true. There was no evidence that Dr. McCarty contacted the engineer at CTE. Ms. Kearney had a telephone conversation with the engineer. The engineer said, I was told not to write a report. But Ms. Kearney never asked him, well, was it Dr. McCarty that told you? She never asked the question. And the testimony from the evidence shows that it was really the architect and not Dr. McCarty who did that. And Dr. McCarty truthfully testified at his deposition that he believed that PERC testing had been done. He would ask what the results were, and he said it was his understanding that the test results showed that it would be sufficient. And then he didn't appear at court at all during trial. So in order for the Norr-Pennington doctrine to apply, there would have to be intentional misrepresentations. There's no evidence of intentional misrepresentations made by Dr. McCarty that would deprive the action of its legitimacy. So I thank the court. If there's any questions, thank you. Thank you very much. This sounded like an evidentiary hearing where the lawyers are giving testimony. It is not correct that this is something in which summary judgment could be granted. It seems plain that there was wrongful activity in connection with discovery, wrongful activity as a result of an agreement. Our RICO claim has withstood dismissal and is valid. Again, we are not saying, we're not trying to set aside to taking our property. We're not trying to say that the Romona School District should have paid more. We are bringing a RICO claim and a civil rights action claim. These are separate. They are different. We are not. This is not like. But RICO requires injury to business or property. What's the injury to business or property here? The amount of value was wrong. We think there's no question about that. So the state court eminent domain trial got it wrong. Not only that, they withheld the documents that were made available to the state court only after the verdict had been received. And the judge decided he did not have jurisdiction to set aside. Thank you, counsel. All right. Thank you. Thank you. Case just argued will be submitted.
judges: Reinhardt, Nguyen, Simon